BRANCH et al. v. TEXAS LUMBER MANUF'G CO.

(Circuit Court of Appeals, Fifth Circuit. June 20, 1893.)

No. 82.

1. DESCENT AND DISTRIBUTION—HUSBAND AND WIFE—TEXAS STATUTES.
Under the Spanish law in force in Texas prior to the act of the republic of December 18, 1837, the widow of a person dying intestate, without children, but leaving other relatives capable of inheriting, did not inherit the deceased husband's estate. By section 2 of that act (Hart. Dig. arts. 574, 3251) the survivor of a husband or wife dying intestate, "leaving no heirs," inherited the estate of the deceased spouse. *Held*, that the act did not change the pre-existing law so that the widow of a person so dying

intestate, March 13, 1838, would succeed, by inheritance, to the real estate of her deceased husband.

**2. SAME.**

The word "heirs," in such act, is not limited to children, but includes other relatives by blood, capable of inheriting.

**3. RES JUDICATA—PROBATE PROCEEDING—FOREIGN ADMINISTRATION.**

Proceedings of a Louisiana probate court adjudicating as to a succession embracing real and personal property of the deceased in that state, and mentioning, but not appraising, claims to Texas real estate, are not in rem as to the Texas lands, and a finding in such proceedings as to heirship is not res judicata as to such lands.

**4. EVIDENCE—HEARSAY—PEDIGREE.**

Evidence as to the birth of a posthumous child, by a witness who never saw it or heard the mother speak of it, but who testified from what people said, is incompetent and inadmissible, as hearsay testimony on a question of pedigree.

**5. SAME.**

Evidence by a witness that the child was born, was a boy, lived two or three weeks, and died; that he never saw the child, or its mother prior to its birth, but testified to what others told him; that two or three weeks after the birth he saw the mother at her father's house; that she told him of the child's birth and death; that her father, mother, and brothers had told him about the child before he saw her,—is competent; there being proof that the mother, and her father, mother, and brothers, were dead when the testimony was offered.

On Rehearing.    Action of trespass to try title by the Texas Lumber Manufacturing Company against Wharton Branch, T. M. McVeigh, C. L. Sisson, Stephen Hines, F. Scroggins, G. J. Collins, and others.    J. B. Abington, E. C. Douglass, and others intervened.    On writs of error sued out by defendants and interveners, the judgment was affirmed because of defects in the transcript of record.    53 Fed. Rep. 849.    Subsequently a rehearing was asked and granted by the court, as appears from the following per curiam opinion filed February 13, 1893:

Our former decision in this case affirmed the judgment of the circuit court because we found in the record neither a waiver of jury, nor a verdict and judgment. The application for a rehearing, now presented, states that there was in fact a waiver of jury, in writing, in the circuit court, which was incorporated and appeared affirmatively in the proceedings on the trial in said cause, as entered in said court; but did not go into the record filed in this court, because the clerk omitted to incorporate said proceedings in full, and counsel for plaintiffs in error did not discover such omission until after reading the opinion of this court.

The showing made, accompanying the application for a rehearing, is that the record was prepared by the clerk of the circuit court under instructions from the counsel for plaintiffs in error as to such papers and documents as ought to go into the record, counsel going so far as to make a list of the number and order of papers proper to go into the record; and the list so prepared for the clerk did not contain the written stipulation, waiving a trial by jury. It further appears that the omission of the written stipulation, waiving a trial by jury, was not observed by counsel until after the decision of the case, because counsel did not examine the record.

Our conclusion is that the negligence in the case is attributable to the plaintiffs in error, and that they, having had their day in this court, and lost their case through their own fault, cannot, in strict justice, claim that a new hearing should be awarded them; and while, to measure justice to them with this strictness might be harsh, to grant their application without terms, or on nominal or trifling terms, would, in effect, license a practice that would cause inconvenience, embarrassment, and injustice to defendants in error and to this court.

The following order will be entered in the case: Ordered, that a rehearing be granted herein, and our former judgment be set aside, provided plaintiffs in error shall, within thirty days from this date, file with the clerk of this court a complete transcript of the proceedings had in the circuit court, duly certified. according to our rules, and shall pay all costs of this court up to and including the date of filing new transcript, including the printing thereof, so far as the same may be necessary.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

McCORMICK, Circuit Judge.    On a former day of this term, for reasons given in our opinion then delivered, without passing on any of the questions presented by the assignment of errors in this case, the judgment of the circuit court was affirmed.    53 Fed. Rep. 849.    On a later day of the term, on the grounds then stated, a rehearing was granted, and the cause has now been reheard, and considered on its merits.    In their brief, plaintiffs in error say:

"There are three errors assigned, upon which we confidently rely for a reversal of this cause, to which we now invite the court's attention: (1) That the trial court erred in excluding the declaration of deceased relatives as to the birth of a child born of the marriage between Henry Rueg and Marie Louise Flores. (2) Holding that the probate proceedings in Louisiana were res judicata as to heirship. (3) Holding that the Spanish law was in force in the republic of Texas March 13, 1838, and that the wife did not inherit from the husband if no legitimate descendants survived him."

These will be noticed in reverse order.

In the first years of the existence of Texas as an independent state, the Spanish law governing testaments and inheritances was in force.    By that law, legitimate descendants were necessary or forced heirs to a distinct portion of the estate of decedents.    The owner of an estate, if he had legitimate descendants, might, by will, transmit only one-fifth of his estate to persons who were not forced heirs.    He could, by his will, transmit to a designated one or ones of his children or grandchildren one-third of the balance of his estate, after deducting the one-fifth above mentioned, and both of these powers of disposition by will could be exercised in favor of a child or grandchild, if the fifth were not, or so far as it was not, disposed of to other uses.    As to the residue of the estate, it descended in equal shares to the children, or through the children to the later descendants.    In default of descendants, the parents, or, in their absence, grandparents, were necessary or forced heirs, to the extent, at least, that only one-third of the estate could be disposed of freely by will.    In default of descendants and ascendants, collaterals or persons related by blood inherited, and, in default of descendants, ascendants, and collaterals, the estate went to the public treasury.    1 White, Recop. bk. 2, tits. 3, 4.    In certain conditions, not necessary to be here defined, a portion of the estate of a husband or wife went to the surviving spouse, but under no circumstances did the surviving husband or wife succeed to the whole estate of the deceased, as heir.    Babb v. Carroll, 21 Tex. 765. Such was the law in force in Texas up to December 18, 1837, when the congress of that republic passed:

"An act authorizing persons to dispose of property by will.

"1. Be it enacted by the senate and house of representatives of the republic of Texas in congress assembled, that legitimate descendants alone shall here-

after be considered forced heirs; and all persons having no legitimate descendants are hereby authorized to dispose by will or otherwise of their estate; any law heretofore existing to the contrary notwithstanding.

"2. Be it further enacted that in case any husband or wife shall die intestate, and leaving no heirs, the survivor shall be the heir, and shall inherit the estate of the deceased spouse." Hart. Dig. arts. 574, 3251.

No further change in the law on this subject was made until after the death of Henry Rueg, which occurred March 13, 1838. On January 28, 1840, a general act "To regulate the descent and distribution of intestate estates" was passed, which provided that estates should pass by inheritance: (1) To the children, or their descendants, of the deceased, if any. (2) If there be no children, then to his or her father and mother in equal proportions; providing for the case of only one parent surviving, for a division of the estate into moieties, the one moiety to go to such surviving parent, and the other to the brothers and sisters or their descendants, if any, but, if there be none such, then the whole estate shall be inherited by the surviving father or mother. (3) If there be neither father nor mother, then the estate passes to the brothers and sisters, and to their descendants, or to such of them as there be. (4) If there be none of the kindred aforesaid, then the inheritance shall be divided into two moieties, one of which shall go to the paternal, and the other to the maternal, kindred. (5) "Where for want of issue of the intestate and of father, mother, brothers, and sisters, and their descendants, the inheritance is directed to go by moieties to the paternal and maternal kindred, if there should be no such kindred on the one part, the whole shall go to the other part; and if there be no kindred either on the one part or the other, the whole shall go to the wife or husband of the intestate, and if the wife or husband be dead it shall go to her or his kindred in the like course as if such wife or husband had survived the intestate and then died entitled to the estate." The act of March 18, 1848, after providing for all the other states of case, with modification not material to be noticed here, provides "that if the deceased have neither surviving father or mother nor surviving brothers and sisters or their descendants then the surviving husband or wife shall be entitled to the whole of the estate of such intestate." This provision is still the law in Texas. Hart. Dig. arts. 581, 595; Rev. St. Tex. art. 1646. Henry Rueg left a surviving wife, who afterwards became the mother of the interveners, plaintiffs in error. They and their coplaintiff in error contend that the mother of interveners, as such survivor, inherited the estate, in Texas, of the deceased spouse. They argue that the words "no heirs," where these words occur in the second section of the act of December 18, 1837, should be construed to be equivalent to, and to mean only, "no children" or legitimate descendants; and they cite Garret v. Nash, Dall. Dig. 498, and Boone v. Hulsey, 71 Tex. 176, 9 S. W. Rep. 531. In Garret v. Nash there could have been no question made as to the construction of this act of December 18, 1837, for the ancestor, in that case, had died in May, 1837. The learned chief justice was discussing an entirely different subject,—the rights to the marital fourth where the widow marries again. He was not able to obtain the Recopilacions, where

the law was compiled by authority, but was compelled to gather it from the text of commentators. Having quoted and discussed a passage from Febrero, in the latter part of which the words, "heirs of the husband," were used, Judge Hemphill said:

"Let us also examine into the full text of the author's position, for although the words, 'heirs of the husband,' in the latter part of this quotation, are general terms, and would ordinarily embrace all persons capable of inheriting the property of the deceased, yet, comparing together the separate portions of this section, I cannot perceive that the established rules of construction would be violated by limiting the words, 'heirs of the husband,' to his children. The author presents the case where the children are rich, and the widow is poor. No allusion is made to the circumstance of the husband dying without children; and, since such a condition of things does not appear to have been in the contemplation of the writer, the terms employed could not properly be extended to include persons not within the scope of his consideration. If this be the proper construction of the remarks of Febrero, they have no application to a case where the widow marries again, there being no children of the former marriage."

In the other case, Mrs. Boone was held to be not entitled to a community interest in the head-right league grant because she was not the wife of the grantee when he immigrated to Texas with his children and his former wife. She could not claim any interest under the statute of 18th December, 1837, because her deceased husband left children. It was in announcing this last proposition that the court used the language greatly relied on by plaintiffs in error, "Under the statute of December 18, 1837, the wife only inherited from the husband where he left no children." This language does not necessarily even imply that when the husband leaves no children the wife inherits under the act of December, 1837. We must keep in view the flow of the writer's argument,—the case before the court,—an ancestor who died in 1838, leaving children. No conceivable limitation can be put on the words "no heirs," in the second section of the act of December 18, 1837, which will exclude the children of the deceased. The court and the writer of the opinion were not concerned with the question whether those words should be limited to the children of the deceased. In the absence of any direct decision on the question by the supreme court of Texas, and in view of the previous law, and of subsequent legislation on the subject, it appears to us that the established rules of construction would be violated by limiting the words "no heirs" to the children of the deceased. We therefore conclude that the circuit court did not err in holding that by the law in force in Texas March 13, 1838, the surviving wife of a decedent who left a father and brother and sister also surviving him, did not inherit the whole of his estate.

The record in this case shows:

"Plaintiff offered in evidence, among other things, the record in the estate or succession of Henry Rueg, deceased, from the probate court of the parish of Nachitoches, state of Louisiana, to prove by said record who were the lawful heirs of Henry Rueg, deceased." "Whereupon the court found that by said record it is shown that a court of competent jurisdiction of the subject-matter had found who were the heirs of Henry Rueg, deceased, and that such finding of the probate court was, as to such heirship, res adjudicata; and the judge further found from said record, even though the question of heirship

was not res adjudicata, that the said succession or administration of Henry Rueg was conducted, carried on, and concluded under such circumstances as to convince him that there was no posthumous child born alive to Marie Louise Rueg, as the fruit of her marriage with Henry Rueg, after Henry Rueg's death, and he would so find the facts to be, irrespective of any adjudication."

On March 19, 1838, five days after the death of Henry Rueg, his brother and business partner, Louis Rueg, presented to the probate court his petition for inventory, in which, among other things, he represented that Marie Louise Flores, mother of interveners, was the wife of his deceased brother; that she was then pregnant,— and prayed the appointment of a curator ad ventrum to take the interest of the unborn child, and for inventory, etc. On the same day, Pedro Flores, the father of said Marie Louise Flores, was appointed such curator, and qualified by taking the required oath. On the same day (March 19, 1838) said Marie Louise, signing herself "M. L. Rueg," and her father, Pedro Flores, signing as curator, signed the inventory of the partnership estate, appraised at $28,504.96½, embracing only lands, slaves, and personal property in Louisiana, and choses in action, and mentioning, but not appraising, claims to land in Texas. On December 8, 1838, Leonard Rueg, father of the deceased, said Louis Rueg, and Sylvia Baup, a sister of the deceased, tendered to the probate court their acceptance of the succession, with benefit of inventory, and procured the appointment of an administrator. In due course of administration, all the property inventoried was sold; the choses in action, as far as practicable, reduced to possession; costs of administration, and claims of creditors established against the succession, were paid; and 26th December, 1840, the final account of the administrator was homologated, the administrator discharged, and his bond as such administrator declared null, void, and canceled. This final account shows that said Louis Rueg received, as his net partnership interest, $895.04½, and that the same amount was carried to the credit of the succession of Henry Rueg, and was accepted by said Louis Rueg, on his own behalf, as heir, and representing the other heirs who had accepted the succession, besides notes and accounts so surrendered to said heirs to the amount of $5,636.51. No notice appears after 19th March, 1838, in the record of the probate proceedings offered, of either Marie Louise (Flores) Rueg, or of Pedro Flores, curator ad ventrum, or of the birth of the child.

As to the lands in Texas, which were not, and could not have been, inventoried and administered in these proceedings in Louisiana, the proceeding was not one in rem; and the question who were entitled to these lands, as the heir or heirs of Henry Rueg, on his death, March 13, 1838, was not adjudicated.

We conclude, therefore, that the circuit court was in error in holding that the finding of said probate court as to such heirship was res adjudicata. But, if such a matter ever can be clearly shown, it is so shown by the record in this case,—that this erroneous view as to the law did not injure the plaintiffs in error. They do not contend that the evidence was inadmissible, and the judge

—to whom the parties submitted their case on both law and fact —says that, irrespective of any adjudication on the question of heirship, the situation and conduct of the parties pending these proceedings, as shown by the record offered, convinced him that there was no posthumous child born alive to Marie Louise Rueg, as the fruit of her marriage with Henry Rueg. Plaintiffs offered to prove the birth of such a child by the testimony of Mrs. Felouise De Soto. Objection was made that her testimony was hearsay, and therefore not admissible. This witness had answered:

"I never saw the child. I only speak and testify from what I heard people say. Mrs. Marie Louise Rueg told me nothing about the death of her child. I never heard her say anything about it."

So far as her testimony was hearsay, it is not brought within the conditions that admit hearsay testimony on a question of pedigree, and was not competent evidence. Plaintiffs in error also offered the testimony of Charles Rambin, to the effect that the child was born, was a boy, lived two or three weeks, and died; that he never saw the child; that he testified to what others told him; that he never saw Mrs. Rueg prior to the birth of the child; that shortly thereafter—two, three, or four weeks—he saw her at her father's house; that she then told him about the child having been born, and having died in two or three weeks; that Mrs. Rueg's father, mother, and brothers had told him about the child before he saw Mrs. Rueg. There was proof that Mrs. Marie Louise Rueg, her father, mother, and brothers, were all dead at the time this evidence of the witness Charles Rambin was offered. Defendant in error moved to exclude this proof on the ground that it was hearsay, and not admissible to show the birth and death of the child, and the circuit court sustained this motion. This evidence was competent. 18 Amer. & Eng. Enc. Law, p. 257, and cases there cited. We cannot say that its exclusion worked no injury to the plaintiffs in error.

The judgment of the circuit court is reversed, and the cause remanded for a new trial.